# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                      CRIMINAL ACTION NO. 2:12-cr-00030

MARVIN GARRETT,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Marvin Garrett's Motion for Judgment of Acquittal or, in the Alternative, Motion for a New Trial [ECF 106]. For the reasons that follow, the motion is **DENIED**.

### I.    BACKGROUND

Defendant Marvin Garrett was charged by an eight-count second superseding indictment filed August 14, 2012 with three counts of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Counts One, Four, and Seven); three counts of distribution of a quantity of cocaine base in violation of 21 U.S.C. § 841(a)(1) (Counts Two, Five, and Eight); and two counts of use of a firearm during and in relation to a drug trafficking crime, that is, distribution of a quantity of cocaine base, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(A)(ii) (Counts Three and Six). The second superseding indictment also contained a notice of forfeiture. Prior to trial, the Government voluntarily dismissed Counts One through Seven and the forfeiture claim, leaving only Count Eight for disposition at trial. (ECF 81.) The

Court conducted a jury trial in this case on October 2 and 3, 2012. The jury returned a verdict of guilty as to Count Eight on October 3, 2012.[1]  (ECF 102.)

  A.  *Evidence Adduced at Trial*

As charged in Count Eight of the second superseding indictment and based on the evidence introduced at trial, the Government's case revolves around a controlled purchase of crack cocaine that took place on the west side of Charleston, West Virginia on January 18, 2012. On that date, Defendant allegedly sold cocaine base to Angel Ann Cummings, a confidential informant working under the direction of the Metropolitan Drug Enforcement Network Team ("MDENT"). Ms. Cummings had routinely purchased crack from Defendant since November 2011. While familiar with Defendant as her crack dealer, she knew him only as "Neno." Ms. Cummings typically purchased her crack by calling Neno's cell phone number, telling him the amount of crack that she wanted to purchase, and setting up a mutually agreed-upon location to conduct the in-person transaction. Neno always personally answered the phone when Ms. Cummings called and personally showed up to make the crack sales.

The controlled purchase was organized by Detective Keven Allen of MDENT. When Ms. Cummings initially approached Detective Allen about working as a confidential informant, she identified one of her dealers as a man living on Temple Street on Charleston's west side known as "Neno." Detective Allen had some familiarity with a man named Marvin Garrett who seemed to fit Ms. Cummings' description. He obtained Garrett's West Virginia Department of Motor Vehicles photograph, which indicated that Garrett lived on 1020 Temple Street. He showed this to Ms. Cummings, who immediately recognized the man in the photograph as Neno.

---

[1] By agreement of the parties, Count Eight of the second superseding indictment was characterized on the jury verdict form as Count One of the indictment.

At about 3:00 p.m. on January 18 and by Detective Allen's direction, Ms. Cummings used her personal cell phone to place an audio recorded telephone call to Defendant.[2] During the call, the two agreed to meet outside the Kickback Lounge on Charleston's west side in ten to twenty minutes for Ms. Cummings to purchase "a hun," or one hundred dollars' worth of crack cocaine. After searching Ms. Cummings for money or contraband that could affect the integrity of the purchase, Detective Allen, joined by MDENT Detectives Justin Hackney, Brandon Tagayun, and Ryan Higginbotham, drove Ms. Cummings to a location within several blocks of the Kickback Lounge. She was outfitted with a body wire transmitter and given a small audio and video recording device. Ms. Cummings placed the small video camera in the pocket of her sweatshirt. The detectives also gave Ms. Cummings one hundred dollars of pre-recorded "buy money." Ms. Cummings then exited the vehicle and walked on foot to meet Defendant.

Soon after Ms. Cummings left the vehicle, the body wire transmitter began to relay static and Detective Allen realized that she was walking out of the wire's range. He started his vehicle and began to follow Ms. Cummings at a distance to maintain reception and to hopefully observe the transaction firsthand. Upon meeting Defendant in the middle of Russell Street in front of the Kickback Lounge, Ms. Cummings exchanged the "buy money" for two "fifties" of what was later identified as crack cocaine. The detectives drove down Russell Street just as the money and drugs were changing hands. Both Detectives Allen and Hackney, who testified at trial, recognized Defendant and could now clearly hear him conversing with Ms. Cummings over the wire. From the driver's seat, Detective Allen observed the transaction from a distance of less

---

[2] As Ms. Cummings, Detective Allen, and Detective Hackney all identified Defendant in court as the distributor in the January 18, 2012 transaction, the Court refers to the man known to Ms. Cummings as Neno and alleged to be Marvin Garrett as "Defendant."

than 15 feet. Defendant did not appear to notice the vehicle full of detectives driving by, apparently due to the vehicle's heavily tinted windows. Detective Allen parked the vehicle at the original location where Ms. Cummings had been let out, called her cell phone to confirm her safety, and immediately recovered the suspected crack cocaine from her when she returned on foot some minutes later.

Four witnesses testified on behalf of the Government at trial: Detective Allen, Detective Hackney, Ms. Cummings, and Staci Taylor, a chemist employed with the Drug Identification Unit of the West Virginia State Police Department. Ms. Cummings, Detective Allen, and Detective Hackney all identified Defendant in open court and testified to his involvement as the crack dealer in the January 18, 2012 controlled purchase. The Government also introduced the videotape of the drug transaction and the audio recording of the telephone conversation. Neither recording identifies Defendant. There is no reference to Defendant's identity during the telephone conversation, and though the video camera captured the audio portion of the drug transaction, the camera's lens was completely obscured by Ms. Cummings' clothing and does not reveal Defendant's face.

Potential concerns about Ms. Cummings' credibility became apparent as soon as she took the witness stand. At just 27 years of age, Ms. Cummings bore the haggard face of a long-time drug user. On direct examination, the Government inquired into her prior drug use, her criminal history, and her motives for working as a paid confidential informant. Ms. Cummings testified to an extensive history of illicit drug use which included the abuse of marijuana, methamphetamines, narcotic pain killers, and crack cocaine. She testified that narcotic pain killers were her current drug of choice and that she had last abused this drug two days prior to

trial. After she had been paid by Detective Allen for her participation in the January 18, 2012 controlled purchase, she testified that she returned just hours later to purchase more crack cocaine from Defendant for her personal use. Ms. Cummings also admitted that she had prior misdemeanor convictions for grand and petit larceny.

This assault on Ms. Cummings' credibility only continued on cross-examination. Defense counsel probed further into Ms. Cummings' history of drug abuse and established her potential bias towards the Government as an informant who gets paid "to buy drugs from people." (ECF 114 at 24.) Ms. Cummings was asked again about her criminal record and confirmed that she had been charged locally with fraudulent schemes to obtain Lortab medication. Defense counsel also questioned Ms. Cummings about her mental health history, to which she testified that she had prior diagnoses of borderline personality disorder, manic depression, and gender identity disorder. She affirmed that she receives supplemental security income benefits as a result—her only other source of income apart from her work as an informant. Ms. Cummings further testified that she had not received any mental health treatment in recent years.

Upon the conclusion of the Government's case in chief, Defendant moved for a judgment of acquittal on the basis of insufficiency of the evidence or, alternatively, failure to disclose favorable impeachment material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Defendant claimed that the Government had failed to disclose evidence of Ms. Cummings' psychiatric diagnoses. The Government conceded that it had been made aware of these diagnoses prior to trial, but could not immediately recall whether this evidence had been disclosed. In any event, the Government argued that disclosure was

5

unnecessary because Defendant's investigator had interviewed Ms. Cummings prior to trial and learned the information firsthand. This argument appeared meritorious because Defendant had just elicited information regarding Ms. Cummings' mental health history on cross-examination. The Court denied the motion based on insufficiency of the evidence and took the *Brady* challenge under advisement. After reconvening the proceedings the following morning, the Court denied Defendant's motion. The Court reasoned, *inter alia*, that Defendant was not prejudiced by the Government's non-disclosure because he made effective use of the impeachment material on cross-examination.

Defendant did not present evidence at trial. After hearing closing arguments and receiving instructions on the second day of trial, the jury deliberated for approximately one hour before returning a guilty verdict.

On October 17, 2012, Defendant filed the pending motion for a judgment of acquittal or, alternatively, a new trial. (ECF 106.) Defendant's motion again raised his *Brady* and *Giglio* challenge. The United States responded in opposition on October 31, 2012. (ECF 107.) In its review of the parties' briefing, the Court determined that the Government's response did not adequately address the *Brady* issue and ordered supplemental briefing. The Government filed a supplemental response on February 1, 2013 (ECF 115), to which Defendant replied on February 8, 2013 (ECF 117). The Court held a hearing on Defendant's motion on March 4, 2013. Having ascertained the facts giving rise to Defendant's contentions to its satisfaction, the Court now issues its ruling.

6

## II. MOTION FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL

### A. Legal Standards

Rule 29(a) of the Federal Rules of Criminal Procedure provides that a district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The standard for deciding a Rule 29 motion for a judgment of acquittal is "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). A guilty verdict is to be upheld if it is supported by substantial and competent evidence. *Glasser v. United States*, 315 U.S. 60, 80 (1942); *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996). In determining the issue of substantial evidence, it is not necessary for the court "to be convinced beyond a reasonable doubt of the guilt of the defendant." *White v. United States*, 279 F.2d 740, 748 (4th Cir. 1960). As such, the court may not usurp the jury's exclusive function by weighing evidence, drawing inferences of fact, resolving evidentiary conflicts, or assessing the credibility of witnesses. *See United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983).

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court should exercise its discretion in this area "sparingly." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (quoting *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997)). "In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). While "the court's authority is

much broader [under Rule 33] than when it is deciding a motion to acquit on the ground of insufficient evidence," *id.*, the court should grant a new trial only if "it would be a miscarriage of justice to let the verdict stand." *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997).

### B. Sufficiency of the Evidence

Defendant argues that he is entitled to a judgment of acquittal or a new trial because the Government's evidence was insufficient to support a conviction for distribution of cocaine base. Defendant contends that the evidence presented at trial was insufficient because 1) the video and audio recordings produced at trial did not identify him, 2) his cell phone and telephone records were not produced, 3) no "buy money" from the controlled transaction was recovered, and 4) he was not arrested immediately following the transaction. The Court finds that these perceived gaps in the evidentiary record do not warrant a judgment of acquittal or a new trial in light of substantial evidence supporting the jury's verdict.

For purposes of a motion for acquittal, the Court views the evidence in the light most favorable to the Government in determining whether any rational trier of fact could have found the essential elements of Defendant's crime beyond a reasonable doubt. *MacCloskey*, 682 F.2d at 473. To sustain its burden as to distribution of cocaine base, the Government had to prove beyond a reasonable doubt that "(1) [the] defendant knowingly or intentionally distributed the controlled substance alleged in the indictment, and (2) at the time of such distribution the defendant knew that the substance distributed was a controlled substance under the law." *United States v. Alerre*, 430 F.3d 681, 689 (4th Cir. 2005) (quoting *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994)). Knowledge may be shown by circumstantial evidence. *United States v. Grubbs*, 773 F.2d 599, 601 (4th Cir. 1985) (citation omitted).

8

First, as to proof of distribution, Ms. Cummings testified that she made a recorded call to her crack dealer and that he agreed to meet her at the Kickback Lounge to sell her one hundred dollars' worth of crack cocaine.  The audio recording of the call confirmed this testimony.  Ms. Cummings then identified Defendant in court as her dealer and the man who sold her crack cocaine outside of the Kickback Lounge on January 18, 2012.  Detective Allen also testified that he later listened to the recorded phone conversation and recognized Defendant's voice.  He further testified that he drove by just as the controlled purchase was taking place and saw, in broad daylight and from a distance of less than 15 feet, Defendant transfer the suspected crack cocaine to Ms. Cummings.  Detective Hackney confirmed Defendant's presence during the buy.  The Government's chemist, Ms. Taylor, testified that she ran an analysis of the substance Ms. Cummings turned over to the detectives and identified it as crack cocaine.

The Government also presented evidence that Defendant knew that the substance he sold to Ms. Cummings was a controlled substance.  During the recorded call, Ms. Cummings tells Defendant that she "need[s] a hun."  Ms. Cummings explained, and Detective Allen confirmed, that "a hun" is street slang for a hundred dollars' worth of crack cocaine. When Ms. Cummings met Defendant outside the Kickback Lounge, she initially exclaimed that he was shorting her because the quantity he handed her appeared to be too small.  Defendant's response was captured in the audio feed played before the jury.  He quells her concern, telling Ms. Cummings that the crack is "straight butter," meaning, as she explained, "good crack."  (ECF 114 at 22.)  Based on this evidence, the Court is fully satisfied that the Government's proof was sufficient to support the jury's guilty verdict.

Though the Court need not review the evidence in the light most favorable to the

9

Government in reviewing the motion for a new trial, the Court concludes that upholding the jury's verdict will not result in a miscarriage of justice. Though it is true that none of the various audio recordings identify Defendant and that the video does not capture his face, the context of Ms. Cummings' and Defendant's relationship explains why Defendant needed no introduction. Ms. Cummings testified that she had purchased crack cocaine from "Neno" on several previous occasions over the course of several months and that on January 18, 2012 she called the same phone number that she had called on previous occasions to contact Neno.

Detective Allen offered further explanation of how, after listening to the audio recording of the call in preparation for trial, he recognized Defendant's voice. The cell phone that Ms. Cummings had called on January 18, 2012 was registered to Alexis Mack, a woman he knew to be romantically involved with Defendant. In response to defense counsel's questioning on cross examination, Detective Allen testified that Alexis Mack's Facebook page once featured a picture of her kissing Defendant. He further testified that he became familiar with Defendant's voice by listening to over 200 hours of recorded telephone conversations Defendant has made from jail since his arrest. In this context, the fact that Defendant is not identified by name and cannot be seen in the recordings is hardly alarming.

Production of Defendant's cell phone, telephone records, or the "buy money" transferred during the controlled transaction was also unnecessary. The Government offered no explanation for the unrecovered buy money, but it is understandable that Defendant was no longer in possession of it by the time of his arrest on February 2, 2012. The Court is similarly unconcerned by the two-week lull between the January 18, 2012 transaction and Defendant's arrest. The distribution charge for which Defendant was ultimately convicted was initially only

one of eight counts charged in the second superseding indictment. The facts supporting the previously dismissed counts dated from July, 2011, approximately six months before the controlled purchase. Defendant had clearly been under investigation long prior to the events of January 18, 2012. Due to the ongoing nature of this extensive investigation, the Court has no reason to question a two week delay in his arrest after the controlled transaction took place.

Defendant also claims that allowing Ms. Cummings' testimony to serve as a basis for his conviction would result in a miscarriage of justice since she suffered from untreated psychiatric disorders and drug addiction. Defendant has not argued that these diagnoses somehow impinged on Ms. Cummings' ability to testify truthfully. The jury certainly could have chosen to distrust Ms. Cummings for a number of reasons, but the Court is of the opinion that Ms. Cummings' frank disclosure of her drug use, criminal history, and psychiatric diagnoses, together with the corroborating testimony of Detectives Allen and Hackney, supports the conclusion that her recollection of the events of January 18, 2012 is an accurate one.

For these reasons, the Court **DENIES** Defendant's motion for a judgment of acquittal or for a new trial based on insufficiency of the evidence.

### III. ALLEGED BRADY/GIGLIO VIOLATION

Defendant also argues that the Government failed to disclose evidence of Ms. Cummings' psychological conditions and drug use in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The Court has ascertained the facts giving rise to this contention only after considerable effort. The Government's initial response to Defendant's motion addressed only its alleged failure to disclose Ms. Cummings' psychiatric diagnoses; it did not respond to Defendant's contention that he was not made aware of Ms.

Cummings' drug use prior to trial. After being ordered to file a supplemental memorandum, the Government admitted that, other than Ms. Cummings' addiction to crack cocaine, it had neglected to disclose evidence of Ms. Cummings' drug use as well. It attempted to deemphasize this oversight, however, by asserting that Defendant may have been independently aware of the information. The Court thereafter held a hearing to establish the facts giving rise to Defendant's motion.

The facts relevant to Defendant's contentions are as follows. A federal grand jury returned the initial indictment against Defendant on February 3, 2012. During an interview conducted by the United States on April 5, 2012, Ms. Cummings advised that she had a history of using crack cocaine and "other illicit drugs." (ECF 115 at 4.) The Government also learned that Ms. Cummings had previously been diagnosed with borderline personality disorder, manic depression, and gender identity disorder. On April 23, 2012, defense counsel filed a motion for additional discovery which specifically requested the disclosure of "information concerning the use of any drug (including alcohol) by the informant," including "the type and amount of drug(s) and the day(s) or time period(s) when the use occurred." (ECF 41 at ¶ 14.) The motion also requested any evidence, including psychiatric records, tending to show that Ms. Cummings' ability to perceive, remember, communicate, or tell the truth was impaired. The Government disclosed evidence of Ms. Cummings' crack cocaine use on April 27, 2012. It made no mention of Ms. Cummings' other drug use, however, and on April 30, 2012, the Government responded to Defendant's motion for additional discovery by stating that it had complied with its disclosure obligations. The Government also denied being in possession of any of Ms. Cummings' psychiatric records, though it did not disclose the existence of the diagnoses themselves.

On May 25, 2012, an investigator associated with the Office of the Federal Public Defender interviewed Ms. Cummings on Defendant's behalf. As recorded in the investigator's notes, Ms. Cummings described her routine crack cocaine purchases with Defendant in detail. When asked about her criminal record, she mentioned that she had been previously charged with fraudulent schemes to obtain prescription narcotics, but did not otherwise describe the extent of her substance abuse. She also reported that she received supplemental security income because she suffered from borderline personality disorder, manic depression, and gender identity disorder. On September 28, 2012—four days before trial—the United States interviewed Ms. Cummings again and learned that she was currently abusing narcotic pain killers and marijuana. The Government did not disclose this information to Defendant. Defendant first learned of the full extent of Ms. Cummings' substance abuse during her direct examination.

Upon being pressed by the Court at the hearing for an explanation of why it had failed to disclose this impeachment material, the Government attributed its actions to innocent oversight. In spite of this concession, the Government contended that its oversight does not rise to the level of a *Brady* violation. First, as to Ms. Cummings' diagnoses, the Government argued that no *Brady* violation occurred because Defendant learned this information through his investigator. It further argued that it has never been in possession of Ms. Cummings' mental health records and had no affirmative obligation to obtain them. Second, as to Ms. Cummings' substance abuse, the Government insists that this evidence was immaterial and that Defendant was not prejudiced by its disclosure during Ms. Cummings' direct examination.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Supreme Court later extended this principle to include the nondisclosure of evidence affecting the credibility of a witness. *Giglio*, 405 U.S. at 154. Under *Giglio*, the prosecution must disclose impeachment evidence when the reliability of a witness may be determinative of a defendant's guilt or innocence. *Id.* The *Giglio* Court nevertheless stated: "We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict[.]" *Id.* (internal citations omitted). Instead, *Brady* requires a finding of materiality. *Id.* When a defendant moves for a new trial on the basis of a *Brady* violation, the defendant must therefore prove that the undisclosed evidence was (1) favorable, either because it is exculpatory or impeaching; (2) suppressed by the prosecution; and (3) material. *Banks v. Dretke*, 540 U.S. 668, 671 (2004); *accord United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001). A violation of *Brady* constitutes a denial of due process and grounds for a new trial. *See Monroe v. Angelone*, 323 F.3d 286, 293 n.5 (4th Cir. 2003).

As an initial matter, the parties agree that the evidence at issue was at least potentially favorable to Defendant. The Court adopts this conclusion with some skepticism. There is no indication, for example, that Ms. Cummings' diagnosis of gender identity disorder adversely reflected on her ability to perceive, relay, or recall information or testify truthfully at trial. Nonetheless, even assuming the favorability of Ms. Cummings' diagnoses and substance abuse history, Defendant's *Brady* challenge fails because this evidence was either not suppressed or not material.

14

*A.     Suppression*

The Court first addresses Defendant's arguments as they relate to the disclosure of Ms. Cummings' psychiatric diagnoses and treatment records. The Government had no obligation to seek out Ms. Cummings' psychiatric records, as they were not in its possession or constructive possession. *See United States v. Pinto*, 905 F.2d 47, 50 (4th Cir. 1990) (the prosecution's disclosure obligations extend only to "documents within the federal government's actual possession, custody, or control." (citing *United States v. Gatto*, 763 F.2d 1040, 1048 (9th Cir. 1985)). The Government informed Defendant months before trial that it did not possess Ms. Cummings' records. Having never been in possession of these records, the Government could not suppress them. *See Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 567 (4th Cir. 1999) ("*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." (*quoting United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975))).

Further, the Government did not suppress evidence of Ms. Cummings' diagnoses because Defendant was independently aware of this information. Common sense dictates that the prosecution cannot suppress information that is known to the defendant. *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) (a defendant is not entitled to the benefit of *Brady* where exculpatory information is available to him or lies in a source where a reasonable defendant might have looked); *see also United States v. Jones*, 34 F.3d 596, 600 (8th Cir. 1994) (no *Brady* violation when the defendant is in a position of parity with the government as far as access to the contested material). Defendant independently learned of Ms. Cummings' mental health disorders months prior to trial through his investigator's interview. From that point on,

15

Defendant had equivalent access to the very information which he argues the Government was compelled to disclose. With nothing to suppress, the Government's oversight in neglecting to disclose this information did not violate Defendant's right to a fair trial.

The same cannot be said for the evidence of Ms. Cummings' drug abuse. Due process requires that *Brady* material must be "disclosed to a defendant in time for its effective use at trial." *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985) (citing *United States v. Higgs*, 713 F.2d 39 (3rd Cir. 1983)). Defense counsel first became aware of the full extent of Ms. Cummings' substance abuse history during her direct examination. Though effective use of this material did not necessarily require significant advance preparation, defense counsel should not have been made to respond to and incorporate this evidence into his line of questioning in the moments before his cross-examination began. Upon the commencement of trial, Defendant was not even aware that this evidence existed. According to the Government's response to his specific request for this material some months earlier, it did not exist. While Defendant's vigilant counsel was able to briefly question Cummings about her drug use in response to her testimony divulged on direct examination, this does not constitute effective use of this highly probative evidence. The Court therefore **FINDS** that the Government suppressed evidence of Ms. Cummings' substance abuse history.

    *B.*    *Materiality*

Ultimately, however, Defendant cannot make the requisite showing of prejudice necessary to warrant a new trial. *See Brady*, 373 U.S. at 87. Impeachment evidence is material where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 678. Contrary to

Defendant's assertion, this standard does not change even though the defendant had specifically requested the evidence's disclosure. *Id.* at 681-83. Defendant cites *United States v. Agurs*, 427 U.S. 97 (1976), to argue that the determination of whether the Government's suppression is material turns on whether a request for the evidence had been made and whether that request was general or specific. *Id.* at 106. The Supreme Court has since clarified, however, that *Agurs* does not necessitate a different standard depending on the existence of or type of request. Instead, the materiality standard requires the reviewing court to determine whether the suppression of evidence "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. Under *Bagley*, the court should assess materiality "in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Id.* at 683.

Despite the Government's conceded failure to meet its disclosure obligations on the subject of the extent of Ms. Cummings' history of drug abuse,[3] Defendant began trial armed with abundant material with which he could potentially impeach Ms. Cummings' credibility. Impeachment evidence fails to meet the *Brady* materiality standard where a witness is effectively impeached on various other grounds. *United States v. Cole*, 293 F.3d 153, 163 (4th Cir. 2002) (finding no reasonable probability that the trial's outcome would have been different where the witness was "impeached in so many other ways"); *see United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) ("[W]here the undisclosed evidence merely furnishes an additional basis on which

---

[3] With no evidence to the contrary, the Court accepts the Government's explanation and **FINDS** that the Government's failure to disclose this information was an innocent oversight and not the result of bad faith.

17

to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial." (citations omitted)); *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) ("Suppressed impeachment evidence is immaterial under *Brady* . . . if the evidence is cumulative or impeaches on a collateral issue. Suppressed impeachment evidence, if cumulative of *similar* impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value." (citations omitted)).

Such was the case here. Defense counsel effectively impeached Ms. Cummings on various grounds, including her prior criminal history, her potential bias as a paid informant, her extensive history of illicit drug use, and her psychological disorders. Between direct and cross-examination, Ms. Cummings testified that she has experimented with marijuana, methamphetamines, heroin, pain killers, and crack cocaine. She testified that narcotic pain killers were her "drug of choice" and that she had abused pain killers two days prior to trial. (ECF 114 at 5.) Ms. Cummings also testified on cross-examination that she had been charged with fraudulent schemes to obtain pain killers in state court and that she worked as a confidential informant with the hope that her state charges would be dismissed or reduced. This contradicted her earlier testimony that she sought out work as a confidential informant to "burn her bridges" with her drug dealers. The Government made no attempt to downplay Ms. Cummings' credibility issues. On direct examination, Ms. Cummings testified that she returned after the conclusion of the controlled purchase to buy more crack cocaine from Defendant that same day. The Government confronted any misgivings the jurors may have had about Ms. Cummings'

credibility during its closing argument, admitting that Ms. Cummings was a "drug addict" but relying on corroborating evidence to reaffirm the truth of her testimony. (ECF 123 at 8.)

Though Defendant insists that Ms. Cummings was a crucial witness at trial and material to the Government's case, the other evidence introduced at trial so strongly compelled Defendant's guilt that Ms. Cummings' testimony was almost rendered superfluous.[4] Detective Allen testified at length about the controls he used to ensure that the controlled buy was legitimate: he searched Ms. Cummings both before and after the transaction, he outfitted her with a wire and recording device, and he followed her in his vehicle, allowing him to observe the transaction himself. Apart from Ms. Cummings, two other eyewitnesses placed Defendant at the scene of the controlled purchase. Detective Allen saw Ms. Cummings and Defendant conduct the hand-to-hand drug transaction. Defendant looked him "right in the eyes" as he drove by. (ECF 121 at 20.) He also heard Ms. Cummings and Defendant's voices clearly over the wire as they conducted the transaction. Detective Allen's familiarity with Defendant's voice was confirmed by his testimony that he had listened to hundreds of hours of recorded telephone calls that Defendant has made while incarcerated. Detective Allen and Ms. Taylor also offered independent evidence that the substance Defendant distributed was crack cocaine.

In light of the varied and substantial evidence with which Ms. Cummings was impeached and the other incriminating testimony offered at trial, no reasonable probability exists that the outcome of Defendant's trial would have been different if the Government had properly

---

[4] Defendant also contends that he was prejudiced by the Government's suppression of Ms. Cummings' substance abuse because, if this information had been disclosed prior to trial, he could have consulted with an expert to tailor his questioning. Again, however, the overwhelming evidence introduced against Defendant at trial convinces the Court that there is no reasonable probability that consultation with an expert would have produced a different outcome.

19

disclosed evidence of Ms. Cummings' psychological history and substance abuse. The Court therefore **FINDS** that no *Brady* violation occurred in this case.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Defendant is entitled to neither a judgment of acquittal nor a new trial. The Court therefore **DENIES** Defendant's motion [ECF 106].

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: October 21, 2013

_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE